Gene INGRAM *v.* CENTURY 21 CALDWELL REALTY

CA 95-189 915 S.W.2d 308

Court of Appeals of Arkansas
En Banc
Opinion delivered February 21, 1996

*Wooten & Slagle, P.A.*, by: *Richard L. Slagle*, for appellant.

*Hobbs, Garnett, Naramore & Strause*, by: *Ronald G. Naramore*, for appellee.

JAMES R. COOPER, Judge. The appellant in this contract case entered into an employment agreement in January 1988 to act as managing broker for the appellee realty. The term of the agreement was "for as long as gross commission annually exceeds that of 1987." At all times after execution of the agreement, the appellee had commissions exceeding those earned in 1987. The appellant was terminated in September 1991 because the business was experiencing severe financial problems. The appellant filed suit against the appellee realty for money damages arising out of an alleged breach of the employment contract. After a bench trial, the circuit judge found that the appellant was terminated for legitimate and proper cause, and entered judgment for the appellee. From that decision, comes this appeal.

For reversal, the appellant contends that the circuit judge erred in admitting parol evidence to determine what cause would justify termination under the contract, and in finding that the

appellant was discharged for legitimate and proper cause. We find no error, and we affirm.

 Over the appellant's objection, the president of the appellee agency, Carol Caldwell, was permitted to testify regarding her understanding of the reasons that would permit the appellant's termination after 1988 pursuant to the employment contract. The appellant argues that the admission of parol evidence was erroneous because the agreement was not ambiguous with regard to the grounds for termination. Although parol evidence is admissible only if an ambiguity exists, *Singh* v. *Riley's, Inc.*, 46 Ark. App. 223, 878 S.W.2d 422 (1994), the initial determination of the existence of an ambiguity rests with the court.[1] *Minerva Enterprises* v. *Bituminous Casualty Corp.*, 312 Ark. 128, 851 S.W.2d 403 (1993). In the case at bar, the agreement was ambiguous with respect to the circumstances under which the appellant could be terminated after 1988. The contract expressly provided that it would in no case be terminable in less than one year (i.e., during 1988) except in the case of gross mismanagement by appellant. Clearly, then, the contract envisioned that some degree of incompetence or neglect of duty would provide grounds for termination. The failure to specify the degree of mismanagement that would justify termination after 1988 rendered the agreement ambiguous.[2] Consequently,

---

[1] The dissenting opinion makes much of the absence of an explicit determination by the trial court that the agreement was ambiguous. However, it clearly appears from the record that the trial judge overruled the objection and allowed testimony concerning the intent of the parties into evidence. Had the appellant desired an express statement of the trial court's conclusion concerning the ambiguity of the agreement, he could have requested one pursuant to Ark. R. Civ. P. 52(a). Our review of the record discloses no such request. We will therefore indulge the long-standing presumption that the trial court acted properly and made the findings necessary to support its judgment. *See Kindrick* v. *Capps*, 196 Ark. 1169, 121 S.W.2d 515 (1938); *see generally First National Bank* v. *Higginbotham Funeral Service, Inc.*, 36 Ark. App. 65, 818 S.W.2d 583 (1991) (Cracraft, J., dissenting).

[2] The dissenting judge argues that the agreement is not ambiguous because, by its terms, the appellant could be terminated only for failure to act in good faith in protecting the assets and reputation of the corporation. The fallacy of this view appears on the face of the agreement, which expressly permits termination during 1988 for gross mismanagement. While the essence of "good faith" is honesty of intention and best efforts, *see McEwen* v. *Everett*, 6 Ark. App. 32, 637 S.W.2d 617 (1982); *Black's Law Dictionary* 822 (4th ed. 1968), "mismanagement" encompasses poor performance or incompetence

the circuit judge did not err in admitting parol evidence to resolve it. *See Minerva Enterprises, supra.*

■ The appellant next contends that the circuit judge erred in finding that he was terminated for good cause. The findings of fact of a circuit judge sitting as a jury will not be set aside on appeal unless they are clearly against the preponderance of the evidence. Ark. R. Civ. P. 52(b). There was evidence that the appellant was responsible for the fiscal management of the office and that he had introduced a number of new expenses in the year preceding his termination. For example, he had procured additional insurance, engaged new referral services, enlarged the office telephone system, placed out-of-state advertisements, obtained an 800 number, and purchased a fax machine. These additional expenses contributed to a fiscal crisis when, during the first quarter of 1991, the gross commissions totalled only $8,000. The record shows that, immediately prior to the appellant's termination, the business was in such serious financial distress that the sum of the bills which needed to be paid at once exceeded the amount of available cash by a wide margin. Utilities had threatened to shut off service and advertisers were refusing to take listings.

■ By its terms, the employment agreement required the appellant to perform the duties of a broker and manager and to act in good faith in protecting the assets and reputation of the corporation. We think it significant that, in the midst of this financial emergency, the appellant intentionally misrepresented the situation to his employer. By his own testimony, the appellant did not accurately report the extent of the fiscal crisis but instead "exaggerated to try to get her attention." We think this misrepresentation was material because it was his employer's perception of the firm's financial distress which prompted the

---

without regard to the actor's intent. *See Webster's New Collegiate Dictionary* 729 (1973). The distinction between these terms is elementary.

Although neither term is nebulous, ambiguity may arise by means other than indistinctness or uncertainty of meaning; for example, ambiguity may also result where the clear wording of conflicting clauses seem to indicate inconsistent results. *See, e.g., Williams* v. *City of Pine Bluff,* 284 Ark. 551, 683 S.W.2d 923 (1985); *Smith* v. *Smith,* 229 Ark. 579, 317 S.W.2d 275 (1958). The ambiguity of the agreement in the case at bar is of the latter sort.

appellant's termination. Given this evidence of bad faith on the part of the appellant, we cannot say that the trial court clearly erred in finding he was terminated for legitimate and proper cause.

Affirmed.

PITTMAN, ROGERS, and STROUD, JJ., agree.

GRIFFEN, J., dissents.

ROBBINS, J., not participating.

WENDELL L. GRIFFEN, Judge, dissenting. I disagree with the result reached by the majority in this case and the reasoning employed in reaching it. The result is obtained by disregarding the parol evidence rule and the related principles that govern the interpretation of parties' intent to written agreements. That error is compounded by the lack of evidentiary support for the conclusion reached by the trial judge that the appellant was terminated for failing to "act in good faith in protecting the assets and reputation of" the firm that employed him.

The trial judge permitted appellant and Carol Caldwell, president of Century 21 Caldwell Realty, to testify about their understanding concerning the grounds upon which appellant could be terminated from the post of Principal Broker and General Manager for the firm under his written employment agreement dated January 18, 1988. Appellant made timely objections to that testimony[1], and argues on his appeal that the trial court committed reversible error by admitting it because the written employment agreement was not ambiguous about the terms for his termination. The trial court overruled appellant's objections and ultimately entered judgment for appellee. The court con-

---

[1] The challenged testimony was abduced during questions posed by counsel for appellee to appellant during cross-examination and to Carol Caldwell while on direct examination. The question posed to appellant was: "[t]urning back to the contract between you and Ms. Caldwell and Ms. Courtney, which is Plaintiff's Exhibit No. 1, at the time you signed that contract, what did you understand the reasons to be for which you could be terminated?" (Appellant's abstract, p. 32). The question posed to Caldwell was: "[u]nder the terms of this contract—and let me hand it back to you again—under the terms of this contract, what did you understand the reasons why Mr. Ingram could be terminated after 1988?" (Appellant's abstract, p. 56).

cluded that the contract called for appellant to be employed for a specific time, that he could only be discharged for cause, and that he was terminated for "legitimate and proper cause."

The pertinent provisions of the written agreement state:

> Gene Ingram agrees to act as Principal Broker and General Manager of Century 21 Accredited Realty. He agrees to perform the duties and assume the responsibilities usually expected of that position. *He will act in good faith in protecting the assets and reputation of that corporation.*
>
> . . . .
>
> *The term of this agreement shall be for as long as gross commission annually exceed that of 1987. In no case will this agreement terminate in less than one year, except in the case of gross mis-management [sic] by Broker. . . .*

(Emphasis added).

The trial court allowed parol testimony from appellant and Caldwell despite appellant's objections that there had been no ruling that the contract was ambiguous. The findings contained in the opinion letter issued by the trial judge do not mention ambiguity at all. Indeed, the record is void of any conclusion that the contract is ambiguous concerning the grounds on which appellant could be terminated. Instead, the trial judge specified in his opinion letter that the agreement between the parties not only allowed for appellant's discharge if annual gross commissions would fall below the 1987 baseline, but also required that appellant act in good faith to protect the assets and reputation of the firm.[2] These were the very terms that the parties wrote into

---

[2] In his opinion letter to the parties, the trial judge first discussed his reasons for finding that appellant was not, as appellee had argued, an employee at will, but rather was an employee hired for a specific term. Paragraphs 4 and 5 of the opinion letter pertain to the grounds for termination and state:

4. The next question then presented is for what "cause" can the Plaintiff [appellant] be discharged. The Plaintiff contends the only "cause" set forth in the agreement is, if the annual gross commissions fall below that of 1987. However, *the agreement does not state that as the only cause for discharge.*

5. *The agreement itself requires the Plaintiff to perform the duties of and assume the responsibilities usually expected of a principal broker and general manager, and requires him to act in good faith in protecting the assets and*

their agreement.

Arkansas law clearly holds that parol evidence is admissible only if an ambiguity exists in a written agreement. Absent ambiguity concerning a term within a written contract, it is reversible error to permit parol evidence in order to explain the meaning of contractual terms. *See Minerva Enter., Inc.* v. *Bituminous Casualty Corp.*, 312 Ark. 128, 851 S.W.2d 403 (1993); *Pizza Hut of America, Inc.* v. *West Gen. Ins. Co.*, 36 Ark. App. 16, 816 S.W.2d 638 (1991). In this case, the trial court made no finding that the agreement between the parties was ambiguous about the grounds for appellant's termination. The agreement specified the term of his employment and the performance expected of him. Therefore, appellant's objections to the testimony abduced from him during cross-examination and from Caldwell on direct examination should have been sustained. The agreement plainly states what the parties intended regarding the term of appellant's employment and what performance would be considered grounds for his termination, so extrinsic proof from the parties about what they understood the grounds for termination to be was improperly admitted into evidence.

In the words of the majority, the "failure to specify the degree of mismanagement that would justify termination after 1988 gave rise to an ambiguity" in the parties' agreement. To the contrary, the explicit wording of the agreement is clear. The parties agreed that appellant would "perform the duties and assume the responsibilities usually expected" of a Principal Broker and General Manager, and added that he "will act in good faith in protecting the assets and reputation of [the] corporation." These words are not unclear or subject to a double meaning, nor do they fail to specify the degree of management expected of appellant in his work. A failure to "act in good faith in protect-

---

*reputation of that corporation. In this Court's view, failure to abide by these conditions would constitute cause for discharge.*
(Emphasis added).

Contrary to the view of the majority, the trial court did not find "that the agreement was ambiguous with respect to the circumstances under which the appellant could be terminated after 1988." To the contrary, the trial court failed to make any ruling about ambiguity or whether the challenged testimony fell outside the parol evidence rule for some other reason.

ing the assets and reputation of that corporation" is anything but a nebulous phrase demanding parol evidence to explain its meaning.[3] Even though appellee disagrees with appellant about whether his performance met the clear standard stated in their agreement, that disagreement requires proof of how appellant has failed to act in good faith in protecting the assets and reputation of the firm. The parties certainly could not deny knowing that this performance standard was in their agreement, even if they had financial incentive to disagree about what it meant.

In *Singh* v. *Riley's Inc.*, 46 Ark. App. 223, 878 S.W.2d 422 (1994), this court held that it was reversible error for a trial judge to receive parol evidence to determine the meaning of the term "cause" concerning the severance pay provision of an employment agreement, because the agreement provision was not ambiguous. Like the trial judge in *Singh*, the majority in this case has erroneously based its decision on the self-serving statements of a party seeking to avoid the obligations imposed by its bargain. Despite clear evidence in the agreement that it would extend as long as gross commissions exceeded the 1987 level, appellee argued that the appellant was an employee at will rather than an employee hired for a specific term. And despite explicit wording that the appellant exercise good faith in performing his duties, the appellee claimed that the agreement was ambiguous concerning the grounds for his termination.

The undisputed proof was that the firm's gross commissions exceeded the 1987 level, on an annual basis, from the time that appellant began work until he was discharged on September 8,

---

[3] "Good faith" has acquired a distinct legal meaning in the law of contracts. Most often, the term is implied in a contract for the sale of goods as required in Uniform Commercial Code. *Adams v. First State Bank*, 300 Ark. 235, 778 S.W.2d 611 (1989) (confirming the "honesty in fact" U.C.C. definition). A trustee is held to a good faith duty of acting "honestly" and with "undivided loyalty."*Riegler v. Riegler*, 262 Ark. 70, 553 S.W.2d 37 (1977). Moreover, the Eighth Circuit and the Arkansas Supreme Court has held an implied covenant of "good faith and fair dealing" present in every employment relationship. *Smith v. American Greetings Corp.*, 304 Ark. 596, 804 S.W.2d 683 (1991).

These cases show that good faith embodies, at minimum, a sense of honesty and fairness in the performance of a contractual duty. Whether the term is implied or, as here, express, the legal meaning does not change. Appellant's conduct in this case in no way suggests dishonesty, unfaithfulness, or unfairness toward his employer.

1991, when, as Caldwell testified during cross-examination, she decided that she could not afford to continue paying him under their agreement due to the financial straits facing the firm. Appellee argues that appellant failed to fulfill the contractual duty to act in good faith to protect the firm's assets and reputation, and asserts that the firm's financial woes in 1991 amounted to proof that appellant failed to act in good faith to protect the firm's assets and reputation. However, proof of financial difficulties is not evidence that the assets and reputation of the business had been jeopardized, or that appellant had failed to exercise good faith to protect them. The only financial factor affecting appellant's employment under the terms of the employment agreement was that the firm's gross commissions exceed the 1987 level. At minimum, before the trial court could have found that appellant had failed to act in good faith in protecting the assets and reputation of the firm, there should have been some proof about how appellant's alleged non-feasance had affected the firm's *assets and reputation*, not cash flow. The proof at trial was that the firm faced bills that exceeded available cash when Caldwell decided to discharge appellant. There was no proof that the bills resulted from non-feasance by appellant, that the bills should not have been incurred, or that appellant failed to bring the firm's financial situation to Caldwell's attention. In fact, the proof was to the contrary. Caldwell and appellant testified that appellant repeatedly attempted to discuss the firm's finances with her. Caldwell routinely avoided taking actions to remedy the firm's situation except for the decision to discharge appellant upon the advice of an official with Century 21 who counseled her that firing appellant would allow the firm to show a profit because it would not have to pay appellant's salary.

When the trial court decided that appellant had failed to comply with the provision in his employment agreement requiring him to exercise good faith in protecting the assets and reputation of the firm, it had before it no proof about the value of the firm. There was no proof showing what assets belonged to the firm, or their value at any material time. There was no proof that the unspecified and unvalued assets had been jeopardized. There was no proof regarding the firm's reputation before appellant was hired, during the time that he worked as the firm's Principal Broker and General Manager, or at the time that he

was discharged, let alone any proof that the firm's reputation had been jeopardized by anything that appellant had done or failed to do. In short, there was no evidence that appellant had failed to act in good faith in protecting the assets and reputation of the firm. As Sherlock Holmes said:

> It is a capital mistake to theorise before one has data. Insensibly one begins to twist facts to suit theories, instead of theories to suit facts.[4]

This case demonstrates the truth of Holmes's logic. Appellee's theory, endorsed by the trial court and now affirmed by the majority, for terminating its written agreement with appellant—that he failed to act in good faith in protecting the assets and reputation of the firm despite the plain evidence that the firm showed a profit during the year that he was terminated—is not proven merely by showing that the firm experienced short-term financial difficulties in 1991. Appellant testified that the real estate market in Hot Springs suffered a decline in the early months of 1991 because of concern about the Persian Gulf War underway at the time. That testimony was uncontradicted. Caldwell testified that the only reason she terminated appellant's employment was that she could not afford him. That is far different from saying that she fired appellant because he failed to act in good faith in protecting the assets and reputation of the firm.

In view of Caldwell's confession that she fired appellant to avoid the cost of his salary, and without possessing proof of the firm's assets and reputation, the trial court had no factual basis for finding that appellant had failed to act in good faith. This was not a matter of weighing conflicting evidence. There was no evidence to weigh. Appellant did not deny that the firm experienced financial difficulties during 1991. In fact, he testified that he repeatedly tried to induce Caldwell to take some action that would provide relief from the problems, and that Caldwell appeared uninclined to do so.

Perhaps the most telling evidence that the trial result produced a "capital mistake" was Caldwell's undisputed testimony.

---

[4] A. Conan Doyle, *Adventures of Sherlock Holmes: A Scandal in Bohemia* 3.

After she fired appellant, admitting to him that a primary reason for his dismissal was his high salary, she offered to continue his employment as an agent rather than a manager. If, as appellee argues and the trial court found, appellant had failed to act in good faith in protecting the assets and reputation of the corporation, it is beyond all reason to believe that the firm would want to employ him in any capacity. Nevertheless, Caldwell testified that she tried to convince appellant to accept employment as an agent. This would have meant different work, to be sure, but it also would have meant less compensation for appellant.[5] The employment agreement provided that appellant would earn ten percent of the first $16,000 received in gross commissions each month, and fifteen percent of additional gross commissions. His compensation was to be fifteen percent of all additional commission income during any year that the firm exceeded $200,000 in gross commissions. The uncontradicted proof at trial was that the firm had increased its gross sales each year between 1988 and 1990, and that 1990 gross sales totalled $276,333. There was also uncontradicted proof that Caldwell had been advised by Chad Kumpe, regional director for Century 21, that the money that could have been her profit was being paid to appellant to manage the firm. Interestingly, appellant was terminated immediately after Kumpe gave Caldwell the advice encouraging Caldwell to pocket appellant's compensation as her profit. As owner of the firm, that was her prerogative. But no court of law should reason that she could do so with impunity, insulated from the legal obligation to pay damages to appellant for breaching the

---

[5] The record shows that gross sales for the firm were $158,213 in 1988, $178,009 in 1989, $276,333 in 1990, $196,313 in 1991 (the year that he was fired), $438,450 in 1992, and that gross commissions in 1993 totaled $605,000. From January through August 1994, gross commissions totaled $451,600. "Commissions" and "sales" appear to be synonymous in the record. Although the firm had gross commissions in 1991 which exceeded those of 1987 (the financial performance standard that the parties wrote into the employment agreement), appellant was terminated despite the plain evidence that the firm had produced higher revenues under his management than it had ever enjoyed. The uncontradicted proof was that appellant had increased the sales force and caused the firm to acquire new equipment in 1990, and that he had earned a substantial income under his employment agreement based upon 1990 sales. Terminating him permitted appellee to pocket his salary during a lean period, and when the lean period ended the firm's owners could continue to pocket what they otherwise would have owed appellant based on the increased revenues that his management efforts had helped to make possible.

contract that she made with him, especially when that contract did not obligate appellant to maintain a profit at any time, for any amount, or over any period of time.

Whether this kind of agreement appears unsound or even foolish is immaterial. The law of contract does not exist to guarantee that competent parties will not enter unprofitable or unsound transactions that are otherwise enforceable. It does exist, however, to ensure that when parties make valid agreements they will be enforced by courts of competent jurisdiction despite the suspicions of the courts that the parties could have done a better job crafting their deals. In the law of contracts, justice means that parties will have their explicit and valid agreements enforced or pay damages for dishonoring them. It does not mean that courts will redraft contracts through *post hoc* analysis by judges who substitute their judgment about what the parties should have or might have intended (had they known the future), in place of the plain terms that the parties negotiated. What a promisor or a promisee might have intended had they known how the effect of their contract terms would unfold over time is irrelevant to the inquiry. This notion of justice may seem rough, but its virtue is that parties to written agreements will trust courts to enforce the plain terms of their agreements, no matter whose ox may be gored.

In this case, the agreement is clear and unambiguous about appellant's employment term and the performance expected from him. The agreement is equally clear that he would be paid a specified percentage of gross monthly commissions *no matter what else happened, including if the firm did not earn a profit or faced dire financial straits*. After all, appellant agreed to be an employee for a set compensation, not a partner or shareholder in the firm. He was entitled to the compensation prescribed in his employment agreement just as any employee is entitled to be paid for his or her labor whether the employer is making a profit or not. Appellant must wonder now about the justice of a system of contract law that permits his former employer to induce him to enter that agreement, pocket the commissions from his efforts as manager, terminate him without proof of any lack of good faith by him in protecting the assets and reputation of the firm, and then go scot free without paying a penny in damages for breaking the agreement it negotiated with him.

For these reasons, I cannot join the decision to affirm the judgment entered below. This case was fully developed at trial, and appellant is entitled to recover damages for the breach of his agreement by appellee. There is no need to remand for a new trial. *See Follett* v. *Jones*, 252 Ark. 950, 481 S.W.2d 713 (1972). Therefore, I would reverse the judgment and remand the case to the trial court with instructions that judgment be entered for appellant based on the proof of the damages that he sustained due to the unwarranted termination of his employment agreement.